IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Case No.  16-cv-02107-LTB

SUZANNE GUIDRY

        Plaintiff,

v.

NANCY A. BERRYHILL, Acting Commissioner of Social Security,

        Defendant.

_____

ORDER
_____

Plaintiff Suzanne Guidry appeals the final decision of the Acting
Commissioner of Social Security ("SSA") denying her application for disability
insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401, *et seq*.
I have considered the parties' briefs (ECF Nos. 12–14) and the administrative
record (ECF No. 9) ("AR").  Oral argument would not materially assist me in
determining this appeal.

Ms. Guidry argues the Administrative Law Judge ("ALJ") improperly
weighed the medical opinion evidence, should have found her disabled based on
SSA's "grid rules," erred in evaluating her credibility, and inadequately accounted
for her mental impairments and work absenteeism.  As I describe below, I disagree
with these arguments.  Accordingly, I **AFFIRM** SSA's decision.

# I. Background

## A. Facts

### 1. Mental Impairments

Ms. Guidry has bipolar disorder. *E.g.*, AR 308. Her treatments have included medication, hospitalization, various forms of psychotherapy, and electro-convulsive treatment ("ECT"). Despite her mental illness, Ms. Guidry earned a college degree in computer information systems and worked as an information technology support engineer before filing for disability. AR 41.

Ms. Guidry was hospitalized in late November 2012, her first psychiatric hospitalization in 20 years. AR 1540. She was depressed, overwhelmed at work, and had passive suicidal ideation. *Id.* She was seeing her primary care physician for psychiatric medications, and he had referred her to the hospital. AR 1540. At the hospital, she started a new antipsychotic medication to address her paranoia, which helped. AR 1541. When she was discharged a few days later, she planned to request medical leave from her job so she could work six hours a day instead of eight, a plan her treating psychiatrist thought "quite appropriate." AR 1541. At discharge, she was "feeling much better." AR 1541.

She participated in group therapy at Centennial Peaks after her discharge. She often described her job as a significant source of anxiety and stress. *E.g.*, AR 1528, 1531, 1533, 1535, 1564. Despite being depressed and having mood swings during the therapy, she was an "emotional leader" among the group. AR 1478.

In December 2012, she started seeing Dr. Susan Ryan, a clinical psychologist,

for individual psychotherapy. AR 1661. Dr. Ryan's treatment notes reflect Ms. Guidry's struggles at work and with anxiety during that time. *Id.*

Ms. Guidry saw Dr. Gerald Chitters, a psychiatrist, for medication management beginning in March 2013. Her mood was "bleak," and she was "very seriously suicidally depressed." AR 904, 908. He adjusted her medications, *e.g.*, AR 904, and she improved by late April, AR 719, and continued to do well in May, AR 718. In June, she took a turn for the worse. AR 717. In July, she reported she couldn't get out of bed and was "completely uninterested in life." AR 715–16. She continued to struggle in August, reporting that she couldn't get up and was "actively suicidal." AR 711. In early September, her mood was unstable and she was "sobbing" at her appointment. AR 710. Dr. Chitters raised the possibility of electroconvulsive therapy (ECT) treatments with Ms. Guidry. *Id.* ECT is a procedure, done under general anesthesia, where electric currents are passed through the brain, intentionally triggering a brief seizure. *See* Mayo Clinic, Electroconvulsive therapy (ECT) Definition, http://www.mayoclinic.org/tests-procedures/electroconvulsive-therapy/basics/definition/prc-20014161 (visited April 28, 2017). It "seems to cause changes in brain chemistry that can quickly reverse symptoms of certain mental illnesses." *Id.* But Ms. Guidry started to do much better later in September, and while she didn't rule out ECT, she also didn't start it. AR 709. She did see a doctor at Centennial Peaks Hospital, who believed ECT could "really help her" and that she had "few other options." AR 924.

When her mental health declined again in November 2013, she decided to try

ECT. AR 706. In late November 2013, Ms. Guidry saw Dr. Leon Que at Boulder Community Hospital to discuss ECT therapy. AR 308–13. She told Dr. Que that suicide was "an eventuality," that she had "continuous passive death wishes" and that she felt as though she had lost 30 IQ points. AR 308. After the appointment, Dr. Que recommended inpatient admission, but Ms. Guidry refused. AR 313. Dr. Que ordered a medical work–up to confirm that Ms. Guidry was a candidate for ECT. *Id.* Dr. Que also predicted that Ms. Guidry would need to be admitted for hospitalization in the near future. AR 312.

Dr. Que was right. In early December 2013, not long after her initial consultation with Dr. Que, she was hospitalized for intrusive suicidal ideation. AR 739. She started bilateral ECT while hospitalized, AR 1611, and Dr. Que adjusted her medications because one was interfering with the effectiveness of the ECT treatments, AR 739, 1641. When discharged after about ten days in the hospital, Ms. Guidry was apprehensive about going back to work. AR 316, 1642. Dr. Que told her that her "job is not to have a job" because her focus should be on getting her depression under control before she thought about returning to work. AR 316, 1642. Ms. Guidry never went back to work after this first round of ECT, but she was paid through April 2014. AR 43.

In January 2014, not long after her discharge from Boulder Community Hospital, Dr. Chitters reported that Ms. Guidry was "terrible," felt "dumb," and reported that the bilateral ECT did not help. AR 700. Ms. Guidry also described the bilateral ECT treatment's cognitive side effects as "unbearable." AR 429, 919.

4

However, the contemporaneous treatment records do not record any negative cognitive side effects.  *See* AR 1611–31.

Ms. Guidry was admitted as an in–patient at Centennial Peaks in late January 2014 because she planned to kill herself.  AR 502–04.  She also started unilateral ECT treatment.  AR 677.  Ms. Guidry reported the unilateral ECT did not have negative cognitive side effects.  AR 429.  Her ECT psychiatrist immediately reported she was "doing better," with fewer obsessive thoughts, less irritability, and "much improved" cognition.  AR 678.  After two treatments, she was "belly laughing," "happy," and her cognition improved again.  AR 672.  However, a physician at Centennial Peaks also noted that Ms. Guidry was still "impulsive."  AR 1367.  He also remarked that it was "amazing she has done so well professionally" given the severity of her mental illness.  *Id.*  The ECT treatments continued to be effective, AR 669, and Ms. Guidry was doing "excellent" despite some issues at work, AR 666.  She was discharged from the hospital in early February.  AR 1378–79.

In February 2014, Ms. Guidry started dialectical behavior therapy (in addition to the ECT) to develop more effective coping skills.  AR 429, 434.  Ms. Guidry had a history of marijuana and alcohol abuse, impulsive behavior, and isolative behavior that she hoped the therapy would address.  AR 434.  She also was stressed about losing her job, disliking her job, and six–figure student loans.  AR 429.  She also reported she was very depressed.  AR 1369, 1371.

Nevertheless, in early March 2014, Ms. Guidry's ECT psychiatrist reported

5

she was "doing excellent." AR 660. He described her as "smiling, bright, cordial, [and] focused" and noted that he "hope[d] this improvement lasts." AR 1373. However, she soon had a relapse, with suicidal ideation and rumination on loss. AR 657. Her doctor increased the frequency of the ECT, *id.*, and Ms. Guidry improved by late March, AR 654. She expressed concern about the prospect of returning to work. *Id.*

Ms. Guidry was "stable" and doing "fairly well" in early April. AR 649. However, her ECT psychiatrist tempered his description of her progress with an explanation that she was "still a far cry from when [she] was best" and was not "able to tolerate work." AR 645. He further explained that her last relapse was "so severe, it may never clear to the point of work functioning." AR 645. But by later April, he concluded she was doing "phenomenally." AR 642. She had graduated from the dialectical behavior therapy program she started in February and reported she felt joy for the first time in years. *Id.* Despite this progress, he also concluded she needed more ECT treatments to prevent another relapse. AR 640. Ms. Guidry continued to do well throughout May. AR 636-39. Throughout her unilateral ECT treatments, treatment records revealed normal memory and cognition. *See* AR 605–79; AR 935–73.

But in early June 2014, she was doing "terribly." AR 632. She had a "clear relapse" with suicidal ideation, which her ECT psychiatrist believed was related to a change in her medications. *Id.* After adjusting her medications and continuing ECT, she began to do better. AR 618–30.

But in August 2014 she had yet another relapse, and her ECT psychiatrist concluded that she probably could not function without weekly ETC and likely could never return to work. AR 614–15. This news upset Ms. Guidry, and it spurred her to try and prove him wrong. AR 611. She was doing well in September and October, AR 605–08, and told Dr. Ryan that her "thinking was somewhat better than the months after bilateral ECT," but she still was not as "sharp" as before those treatments, AR 1676.

She went to Florida for part of the winter and told Dr. Ryan that she functioned relatively well there, despite issues with obtaining treatment. AR 1677 (notes indicating that "trip went pretty well" but describing problems obtaining medications and ECT); AR 1679–82. She said that once she returned and restarted ECT, she felt better even though she was "zonked out" from the treatments. AR 1683.

Dr. Stuart Kutz, a psychologist, examined Ms. Guidry in May 2015 and reviewed some medical records. AR 849–55. He concluded her attention, concentration, persistence and pace were moderately to markedly impaired, and he questioned whether her memory and "perhaps other cognitive functions" were mildly impaired. AR 855. Dr. Kutz did not specify where he believed she fell on the spectrum from moderate to marked impairment. *Id.*

Dr. Sara Sexton, a psychologist, reviewed some of Ms. Guidry's medical records in May 2015, as well as Dr. Kutz's opinion. She generally agreed with Dr. Kutz's assessment but opined that Ms. Guidry's impairments were on the moderate

end of the spectrum rather than the marked end. AR 72, 73–75. She concluded that Ms. Guidry could do work that did not involve significant complexity or judgment, had limited interaction with the general public, and did not involve prolonged contact with co–workers or supervisors. AR 75.

In August 2015, Ms. Guidry reported she was doing well, with more energy and fewer suicidal thoughts. AR 858–61; AR 1697–98. In October 2015, she was walking daily, feeling a "creative spark" for the first time in years, and trying to take an online course. AR 1701.

In November 2015, Dr. Chitters completed a medical source statement. He opined that Ms. Guidry had some moderate and some marked impairment in understanding and memory, in sustaining concentration and persistence, and in social interaction. AR 1703–04.

### 2.    Physical Impairments

Ms. Guidry has fibromyalgia, joint pain, lower back pain related to degenerative disc disease, and is obese. In May 2015, she saw Laura Moran, D.O., for an agency–ordered physical consultative examination. AR 840–45. Dr. Moran's examination findings and the imaging she reviewed revealed no significant abnormalities. AR 840, 842-45. Dr. Moran concluded that Ms. Guidry could alternate sitting, standing, and walking for eight hours a day, carry and lift about 20 pounds, bend (but not repeatedly), and do all daily self–care activities, and perform repetitive motion and fine motor manipulation with her hands. AR 845. At the administrative hearing, Ms. Guidry testified that nerve pain medication

alleviated her fibromyalgia pain throughout the day.  AR 45.

## B.    Procedural History

Ms. Guidry filed her claim for disability and disability insurance benefits

with SSA in June 2014, alleging disability beginning May 1, 2014.  AR 150–56.  Ms.

Guidry later amended the onset date to December 1, 2013.  AR 43.  After SSA

initially denied her claim, AR 62–78, Ms. Guidry requested a hearing, AR 88.  The

hearing took place on December 18, 2015, before an ALJ.  AR 37–61.  On January

20, 2016, the ALJ denied Ms. Guidry's claim, concluding that Ms. Guidry was not

disabled within the meaning of the Social Security Act.  AR 17–36.  Ms. Guidry

asked SSA's Appeals Council to review the ALJ's decision.  AR 12.  On June 23,

2016, the Appeals Council denied review, AR 1–6, making the ALJ's decision the

final decision of SSA, *see Doyal v. Barnhart*, 331 F.3d 758, 759 (10th Cir. 2003).  On

August 19, 2016, Ms. Guidry timely filed this appeal.  (ECF No. 1.)  I have

jurisdiction pursuant to 42 U.S.C. § 405(g).

## II.  Legal Standards

## A.    SSA's Five–Step Process for Determining Whether a Claimant Is "Disabled"

A claimant is "disabled" under Title II of the Social Security Act if she is

unable to "engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not

less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see also Bowen v. Yuckert*, 482 U.S.

137, 140 (1987).  SSA has established a five–step sequential evaluation process for

determining whether a claimant is disabled and thus entitled to benefits.  20 C.F.R. § 404.1520.

At step one, SSA asks whether the claimant is presently engaged in "substantial gainful activity."  If she is, benefits are denied and the inquiry stops.  § 404.1520(b).  At step two, SSA asks whether the claimant has a "severe impairment"—that is, an impairment or combination of impairments that "significantly limits [her] physical or mental ability to do basic work activities."  § 404.1520(c).  If she does not, benefits are denied and the inquiry stops.  If she does, SSA moves on to step three, where it determines whether the claimant's impairment(s) "meet or equal" one of the "listed impairments"—impairments so severe that SSA has determined that a claimant who has them is conclusively disabled without regard to the claimant's age, education, or work experience.  § 404.1520(d).  If not, SSA goes to step four.  At step four, SSA determines the claimant's residual functional capacity ("RFC")—that is, what she is still able to do despite her impairments, and asks whether the claimant can do any of her "past relevant work" given that RFC.  § 404.1520(e).  If not, SSA goes to the fifth and final step, where it has the burden of showing that the claimant's RFC allows her to do other work in the national economy in view of her age, education, and work experience.  § 404.1520(g).  At this step, SSA's "grid rules" may mandate a finding of disabled or not disabled without further analysis based on the claimant's age, education, and work experience.  20 C.F.R. Pt. 404, Subpt. P, App. 2.  In contrast with step five, the claimant has "the burden of establishing a prima facie case of

disability at steps one through four." *Doyal*, 331 F.3d at 760.

## B.     Standard for Reviewing SSA's Decision

My review is limited to determining whether SSA applied the correct legal standards and whether its decision is supported by substantial evidence in the record. *Williamson v. Barnhart*, 350 F.3d 1097, 1098 (10th Cir. 2003). With regard to the law, reversal may be appropriate when SSA either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards. *See Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996). With regard to the evidence, I must "determine whether the findings of fact . . . are based upon substantial evidence, and inferences reasonably drawn therefrom. If they are so supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970). "Substantial evidence is more than a scintilla, but less than a preponderance; it is such evidence that a reasonable mind might accept to support the conclusion." *Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence. *Clifton v. Chater*, 79 F.3d 1007, 1009–10 (10th Cir. 1996). I may not reweigh the evidence or substitute my judgment for that of the ALJ. *Casias v. Secretary of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991).

## III.  The ALJ's Decision

The ALJ followed the five–step analysis outlined above. At step one, the ALJ

found that Ms. Guidry had not engaged in substantial gainful activity since her alleged onset date and met the insured requirements of the Social Security Act through December 31, 2019. AR 19. At step two, the ALJ found Ms. Guidry had several severe impairments: fibromyalgia, obesity, and bipolar disorder. *Id.* At step three, the ALJ concluded that during the relevant period, Ms. Guidry 's impairments did not meet or equal any of the "listed impairments" that mandate a conclusive finding of disability under the social security regulations. AR 19–21. At step four, the ALJ found that Ms. Guidry had the following RFC:

> [T]he claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that claimant is limited to unskilled work. She can frequently handle and occasionally climb, balance, stoop, kneel, crouch and crawl. Mentally, the claimant should have limited exposure to the public and co–workers.

AR 21. The ALJ determined that Ms. Guidry was unable to perform any past relevant work and proceeded to step five. AR 29. At step five, the ALJ determined that given Ms. Guidry's age, education, work experience, and RFC, there were jobs that exist in the national economy that Ms. Guidry can perform, specifically a housekeeper, laundry worker, and mail room clerk. AR 30. The ALJ accordingly concluded that Ms. Guidry was not disabled under the Social Security Act during the relevant period. AR 31.

## IV. Analysis

### A. Opinion Evidence

Ms. Guidry argues the ALJ improperly discounted the opinions of Ms.

Guidry's treating and examining sources in favor of the opinion of Dr. Sexton, a consulting source.

The amount of deference due to an opinion about a claimant's impairments varies depending on its source. An ALJ should "[g]enerally . . . give more weight to opinions from [a claimant's] treating sources." 20 C.F.R. § 404.1527(c)(2). In deciding how much weight to give a treating source opinion, an ALJ must complete a two-step inquiry. *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011). An ALJ must first determine whether the opinion qualifies for "controlling weight." *Id.* An opinion from a treating source is entitled to controlling weight if it is both "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and consistent with other substantial evidence in the record. *See* Titles II & XVI: Giving Controlling Weight to Treating Source Med. Opinions, SSR 96-2P, 1996 WL 374188, at *1 (S.S.A. July 2, 1996). Even if not entitled to controlling weight, a treating source's opinion "may still be entitled to deference." *Id.* The amount of deference due depends on weighing several factors:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

20 C.F.R. §§ 404.1527(c), 416.927(c). An ALJ uses these same factors to analyze opinions from examining and consulting medical sources. §§ 404.1527(c),

416.927(c). "It is the ALJ's duty to give consideration to all the medical opinions in the record. [Sh]e must also discuss the weight [s]he assigns to such opinions." *Keyes–Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012) (citation omitted). An ALJ may dismiss or discount an opinion from a treating source only if she provides "specific, legitimate reasons" for the rejection. *Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012).

### 1.   Dr. Sexton

The ALJ here credited Dr. Sexton's opinion that Ms. Guidry could do work if it not involve significant complexity or judgment, involved limited interaction with the general public, and did not involve prolonged contact with co–workers or supervisors. AR 75. Ms. Guidry takes issue with the significant weight the ALJ afforded Dr. Sexton's opinion because Dr. Sexton did not examine Ms. Guidry and her records review did not include Dr. Chitters's or Dr. Ryan's files.

As for the first argument—Dr. Sexton did not examine Ms. Guidry—I agree with the Commissioner that this factor is not dispositive. Whether a medical professional examines a claimant is one of the six factors relevant to weighing an opinion. 20 C.F.R. §§ 404.1527(c), 416.927(c). But even where, as here, that factor weighs against an opinion, other factors can weigh heavily enough that the opinion is entitled to great weight.

As for the second argument—that Dr. Sexton's review of the record was too limited—it fails because the ALJ considered the entire record in deciding what

weight to give Dr. Sexton's opinion. The weight an ALJ may give to the opinions of nonexamining sources "depend[s] on the degree to which they provide supporting explanations for their opinions," and an ALJ should "evaluate the degree to which these opinions consider all of the pertinent evidence in [a] claim, including opinions of treating and other examining sources." 20 C.F.R. § 416.927(c)(3). The ALJ here extensively discussed Dr. Chitters's and Dr. Ryan's files as well as Dr. Chitters's opinion. AR 26–27. She explained that those records did not support a finding of disability, giving specific reasons, with citations to the record, for her decision. *Id.* While Dr. Chitters's records showed that Ms. Guidry had times when she struggled significantly with her mental illness, they also reflected times when Ms. Guidry did well: when she was going to the local YMCA for exercise, reporting good results from treatment, and taking on–line classes. AR 27. Ms. Guidry argues these records reflect the waxing and waning of her mental illness rather than evidence she was not disabled. While this may be a valid view of the record, I may not substitute my judgment for the ALJ's. *Casias*, 933 F.2d at 800.

Additionally, the ALJ discussed Dr. Ryan's records and gave specific reasons for finding some of Ms. Guidry's complaints (which were reflected in Dr. Ryan's notes) less than fully credible. AR 26. Thus, nothing in the new records rendered Dr. Sexton's opinion stale or unsupported by substantial evidence. *See Tarpley v. Colvin*, 601 F. App'x 641, 644 (10th Cir. 2015) (holding ALJ reasonably gave significant weight to the opinion of a nontreating agency physician even though the physician did not review later opinions issued by other physician or subsequent

medical records, where ALJ throughly reviewed records and nothing in them suggested a material change in the claimant's condition). The ALJ adequately considered the evidence, sufficiently explained the weight she afforded to Dr. Sexton's opinion, and I accordingly decline to reverse her decision on this basis. *See Keyes–Zachary*, 695 F.3d at 1166.

## 2. Dr. Chitters

In a related argument, Ms. Guidry argues the ALJ should not have discounted Dr. Chitters's opinion that Ms. Guidry had some moderate and some marked impairment in understanding and memory, in sustaining concentration and persistence, and in social interaction. However, the ALJ gave "specific, legitimate reasons" for not giving Dr. Chitters's opinion controlling weight and partially rejecting it. *See Chapo*, 682 F.3d at 1291. The ALJ permissibly pointed to evidence showing Dr. Chitters's opinion was inconsistent with the record, including his own treatment notes. For example, Dr. Chitters's notes reflected "few complaints and no clinical or objective findings of any significant cognitive or memory problems," even though he opined that Ms. Guidry was markedly limited in her abilities to understand, remember, and carry out short instructions, maintain concentration for extended periods, complete a normal workday or workweek, and perform at a consistent pace. AR 27. He also failed to conduct any objective testing to support his opinion about Ms. Guidry's impairments. *Id.* The ALJ also pointed to other evidence in the record that undermined Ms. Guidry's allegations of disability and Dr. Chitters's opinion: she read a lot, she reported being the most productive worker

on her team, and she was interviewed for a promotion.  AR 27.  The ALJ's decision to partially discount Dr. Chitters's opinion is well–supported by the record, and I will not disturb it.

### 3. Dr. Kutz

Ms. Guidry also takes issue with the weight the ALJ afforded to Dr. Kutz's opinion.  But as with the other medical opinions, the ALJ supported her assessment with evidence in the record.  She concluded that to the extent Dr. Kutz opined Ms. Guidry had marked limitations, his opinion was inconsistent with Ms. Guidry's activities of daily living.  AR 28.  That is a valid reason for giving less weight to Dr. Kutz's opinion.  *Newbold v. Colvin*, 718 F.3d 1257, 1266 (10th Cir. 2013) (holding ALJ permissibly rejected limitations imposed by treating physician that were inconsistent with the claimant's activities of daily living).  Morever, the ALJ did not discount Dr. Kutz's opinion in its entirety.  Dr. Kutz opined that Ms. Guidry's attention, concentration, persistence and pace were *moderately to markedly* impaired, and he questioned whether her memory and "perhaps other cognitive functions" were mildly impaired.  AR 855.  Dr. Sexton reviewed this opinion (and many medical records) and agreed that Ms. Guidry was impaired, but she concluded that the impairments were on the moderate end of the spectrum rather than the marked end.  AR 72, 73–75.  The ALJ thus actually credited Dr. Kutz's opinion to the extent that it endorsed mild to moderate limitations.  Given that Dr. Kutz did not specify where Ms. Guidry fell on the spectrum from moderate to marked impairment, it was more than reasonable for the ALJ to credit Dr. Sexton's

well–supported opinion that it was more on the moderate side.

### 4.    Other Evidence

Finally, Ms. Guidry makes a passing suggestion, in her statement of facts, that the ALJ improperly weighed the "opinions" of Dr. Que and Dr. Ryan. However, neither Dr. Que nor Dr. Ryan provided formal opinions. Ms. Guidry presumably thinks the ALJ should have extrapolated their opinions from their treatment records. Because Ms. Guidry fails to develop this vague argument in any meaningful way, I consider it waived. *See Keyes-Zachary*, 695 F.3d at 1161 ("We will consider and discuss only those . . . contentions that have been adequately briefed for our review.").

## B.    Step Three

Ms. Guidry argues the ALJ should have found that Ms. Guidry's bipolar disorder met or equaled Listing 12.04, the listing for depressive, bipolar, and related disorders. The listings at 20 C.F.R. pt. 404, subpt. P, app. 1 are examples of medical conditions which ordinarily prevent an individual from engaging in any gainful activity. Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results. *Id.* For a claimant to show that her impairment matches a listing, it must meet all of the specified medical criteria. *See* Titles II and XVI: Finding Disability on the Basis of Med. Considerations Alone-the Listing of Impairments and Med. Equivalency, SSR 83-19 (1983), 1983 WL 31248, at *2 ("An impairment 'meets' a listed condition . . . only when it manifests the specific findings described in the set of medical criteria for that listed

impairment.").  An impairment that manifests only some of those criteria, no matter

how severely, does not qualify.  *See id.*

At the time of the ALJ's decision in January 2016, the criteria for Listing

12.04 were:

A.    Medically documented persistence, either continuous or intermittent, of one
      of the following:

      1.    Depressive syndrome characterized by at least four of the following:
            a. Anhedonia or pervasive loss of interest in almost all activities; or
            b. Appetite disturbance with change in weight; or
            c. Sleep disturbance; or
            d. Psychomotor agitation or retardation; or
            e. Decreased energy; or
            f. Feelings of guilt or worthlessness; or
            g. Difficulty concentrating or thinking; or
            h. Thoughts of suicide; or
            i. Hallucinations, delusions, or paranoid thinking; or

      2.    Manic syndrome characterized by at least three of the following:
            a. Hyperactivity; or
            b. Pressure of speech; or
            c. Flight of ideas; or
            d. Inflated self-esteem; or
            e. Decreased need for sleep; or
            f. Easy distractibility; or
            g. Involvement in activities that have a high probability of painful
             consequences which are not recognized; or
            h. Hallucinations, delusions or paranoid thinking; or

      3.    Bipolar syndrome with a history of episodic periods manifested by the
            full symptomatic picture of both manic and depressive syndromes (and
            currently characterized by either or both syndromes);

AND

B.    Resulting in at least two of the following:

      1.    Marked restriction of activities of daily living; or
      2.    Marked difficulties in maintaining social functioning; or

19

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration;

OR

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, subpt. p, app. 1 (effective August 12, 2015 to May 23, 2016).

The ALJ concluded that Ms. Guidry did not meet the paragraph B or paragraph C criteria. AR 20. She did not discuss the paragraph A criteria. *Id.*

With respect to the paragraph B criteria, the ALJ concluded that Ms. Guidry did not have any extreme or marked limitations in her ability to (1) understand, remember, or apply information; (2) interact with others, concentrate, persist, or maintain pace, or (3) adapt or manage herself. In making this conclusion, she credited Dr. Sexton's opinion that Ms. Guidry had only mild to moderate impairments. *Id.* The ALJ also credited Dr. Sexton's opinion that Ms. Guidry had one to two episodes of decompensation when she was hospitalized but concluded those isolated instances were insufficient to meet the requirement of "repeated" episodes. *Id.* at 20–21. As I already described above, the ALJ gave good reasons for

the weight she assigned to these opinions, including describing in detail the evidence suggesting Ms. Guidry did not have extreme or marked impairments in these areas. Thus, substantial evidence—"more than a scintilla, but less than a preponderance"—supports the ALJ's decision on this point. *Lax v. Astrue,* 489 F.3d 1080, 1084 (10th Cir. 2007).

With respect to the paragraph C criteria, the ALJ concluded that because Ms. Guidry could not meet the requirement for "[r]epeated episodes of decompensation, each of extended duration" under paragraph B, she also could not meet that same requirement under paragraph C. AR 21. She also concluded that Ms. Guidry could not show a residual disease process or a current history of one or more years' inability to function outside a highly supportive living arrangement. *Id.* These conclusions find support in Ms. Guidry's testimony about her activities of daily living, which include driving and handling finances, in Dr. Sexton's opinion, and in medical records that show substantial improvement in Ms. Guidry's condition with treatment. Accordingly, the ALJ pointed to substantial evidence to support her interpretation of the record, and I will not disturb her conclusion that Ms. Guidry did not meet Listing 12.04.

## C.     Credibility Determination

Ms. Guidry also challenges the ALJ's assessment of her credibility. "Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence. However, findings as to credibility should be closely and affirmatively linked to

substantial evidence and not just a conclusion in the guise of findings." *Newbold v. Colvin*, 718 F.3d 1257, 1267 (10th Cir. 2013) (quotation omitted).

The ALJ gave several reasons, with specific support from the record, for finding Ms. Guidry less than fully credible. She accurately pointed out that Ms. Guidry had made inconsistent statements about her disability, testifying she could not get out of bed four days a week but never reporting this to her providers. AR 23. Ms. Guidry insists she did actually report this to her providers, pointing to a record where she once reported she could not get out of bed. But once saying she couldn't get out of bed—before the alleged disability onset date—is not the same as reporting she regularly remains in bed four days a week, and the ALJ's determination her testimony was inconsistent with the record is supported by substantial evidence in the record.

Even if that particular finding was inconsistent with the record, it would not alter my decision because the ALJ provided several additional reasons for her credibility determination. *See Pickup v. Colvin*, 606 F. App'x 430, 433 (10th Cir. 2015) (unpublished) (affirming ALJ's credibility determination despite some "problems" with it because substantial evidence supported the ALJ's determination that the claimant was not fully credible). She reported only a "little" memory impairment from her ECT treatments to Dr. Kutz but testified to significant problems. AR 23. She testified she could not get along with others, but she was an "emotional leader" in group therapy, found the group supportive, and reported it was "exactly what I needed." *Id.* Despite struggling for years with mental illness,

Ms. Guidry was able to get a college degree and work at highly skilled jobs. *Id.*
These are all legitimate reasons for the ALJ's credibility assessment.

Morever, I disagree with Ms. Guidry's suggestion that the ALJ improperly
considered that her depressive symptoms were related to distaste for her job and
financial concerns. The ALJ did not, as Ms. Guidry suggests, dismiss Ms. Guidry's
impairments because of their source. Instead, the ALJ concluded that her
impairments were mild to moderate rather than severe, and she observed that they
were triggered by job and financial stress. AR 23. This accurate observation does
not undermine the ALJ's findings.

## D. Mental Limitations and Absenteeism

Ms. Guidry also argues that the ALJ's RFC determination failed to account
for all her mental impairments and the fact that, in Ms. Guidry's view, her mental
illness would require her to regularly miss work. RFC represents "the most [the
claimant] can still do despite [her] limitations," 20 C.F.R. § 404.1545(a)(1), and
must include "all of [the claimant's] medically determinable impairments," *id.* §
404.1545(a)(2). An RFC determination is an administrative assessment based on
all the evidence of how the claimant's impairments and related symptoms affect his
or her ability to perform work-related activities. *Young v. Barnhart*, 146 Fed. App'x
952, 955 (10th Cir. 2005) (unpublished). The final responsibility for determining
the claimant's RFC rests with the Commissioner and is based upon all the evidence
in the record. *Id.*; *see also* Titles II & XVI: Assessing Residual Functional Capacity
in Initial Claims, SSR 96-8P 1996 WL 374184, at *7 (S.S.A. July 2, 1996) (indicating

that the RFC assessment by the ALJ must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence).

As I already explained above, the ALJ gave good reasons for the weight she assigned to medical opinions and to her credibility assessment. Using those reference points, she asked the vocational expert whether jobs existed that someone with Ms. Guidry's limitations could perform. Among other things, the ALJ included a limitation to unskilled jobs, which accounted for her mild to moderate mental impairments. *See Smith v. Colvin*, 821 F.3d 1264, 1269 (10th Cir. 2016) ("[W]e have held in a published opinion that an administrative law judge can account for moderate limitations by limiting the claimant to particular kinds of work activity."). While Ms. Guidry argues this limitation was insufficient, I may not reweigh the evidence. Instead, I look only to whether substantial evidence supports the ALJ's decision. *Lax,* 489 F.3d at 1084. The ALJ's lengthy and detailed opinion here easily meets that standard.

## V. Conclusion

For the reasons described above, I **AFFIRM** the Commissioner's final order.

**Dated**: May  _11_ , 2017 in Denver, Colorado.

BY THE COURT:


  s/Lewis T. Babcock               
LEWIS T. BABCOCK, JUDGE
